1

2                    IN THE UNITED STATES DISTRICT COURT

3                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

4

5   JOHNNY A. MARTINEZ,                    No. C 08-04736 CW (PR)

6            Petitioner,                    ORDER DENYING PETITION FOR WRIT
                                            OF HABEAS CORPUS; DENYING
7        v.                                 CERTIFICATE OF APPEALABILITY

    MICHAEL S. EVANS, Warden,
8
             Respondent.
9   _____/

10

11        Petitioner Johnny A. Martinez is a prisoner of the State of

12  California, incarcerated at Salinas Valley State Prison.  On

13  October 15, 2008, Petitioner filed a pro se petition for a writ of

14  habeas corpus pursuant to 28 U.S.C. § 2254 challenging the validity

15  of his 2005 state convictions.  Respondent filed an answer on

16  September 21, 2009.  Although given an opportunity to file a

17  traverse, Petitioner did not do so.  Having considered all of the

18  papers filed by the parties, the Court DENIES the petition for writ

19  of habeas corpus.

20                               BACKGROUND

21  I.  Procedural History

22        On March 25, 2005, a Santa Clara County superior court jury

23  convicted Petitioner of one count of first degree murder, in

24  violation of California Penal Code § 187, and found that the murder

25  involved torture and personal use of a deadly or dangerous weapon.

26  On March 28, 2005, the trial court found Petitioner had five prior

27  strike convictions.  (Resp. Ex. 1 at 475.)  On May 27, 2005, the

28  trial court sentenced Petitioner to life without the possibility of

    parole plus one year.  (Id. at 511-12.)

**United States District Court**
For the Northern District of California

Petitioner timely appealed to the California Court of Appeal, raising five issues.  On May 10, 2007, the court of appeal filed a written opinion rejecting all claims and affirming the judgment. (Resp. Ex. 6.)  Petitioner proceeded to the California Supreme Court, which denied his petition in a one sentence order on August 15, 2007.  (Resp. Ex. 8.)

II.  Statement of Facts[1]

The Prosecution's Case

Ruby Aguirre has known [Petitioner] since she was in the fourth grade.  At times they have been boyfriend and girlfriend and at other times they would not speak to each other.  They last dated in 1995 and in 2003 Aguirre considered [Petitioner] to be just a friend.  Aguirre met the victim of the homicide, Raymond Atondo Jr. (Atondo), in February 2002. They dated for about one year and broke up in February 2003.

One evening in August 2003, Atondo arrived at Aguirre's home unannounced.  Aguirre took Atondo into her room to talk. Atondo said that he did not want to talk.  Atondo was aggressive and hurt Aguirre both physically and emotionally during a sexual encounter.  Aguirre became depressed after the encounter.  In early September 2003, [Petitioner] asked Aguirre what was wrong.  She started crying and told him that Atondo had hurt her and that she knew that it was over with Atondo.  [Petitioner] became very agitated and angry.  He asked Aguirre if she wanted him to take care of it.  He said that he could make a phone call and have Atondo beat up or killed, whatever she wanted.  Aguirre told [Petitioner] to leave Atondo alone.

A stun gun was sent from a Minnesota company to [Petitioner] at his home address, and was delivered on September 24, 2003. A stun gun causes contortion of the muscle under the skin it touches, resulting in a tremendous amount of pain.  However, it does not actually immobilize the victim or cause disorientation.  Stun guns are meant to cause so much pain that the victim will stop resisting. [Petitioner] later told Aguirre that he had purchased a stun gun for her, for her protection.  Yet, he never gave the stun gun to her.

---

[1]  The statement of facts is taken from the California Court of Appeal opinion.  See People v. Martinez, No. H028927, 2007 WL 1367501 (Cal.App. 2007).  (Resp. Ex. 6.)

In October and November 2003, during two telephone conversations, [Petitioner] told Aguirre about Asian gang members that he knew and said that "'they'" were watching and following Atondo.  During one conversation, [Petitioner] said that "'they'" went inside an apartment thinking that it was Atondo's, but it was the wrong apartment.  Aguirre told [Petitioner] that she did not care, and told [Petitioner] to leave it alone.

On November 15, 2003, Atondo called Aguirre and told her that his daughter Jesalia was ill and wanted to see her.  Because [Petitioner] was working on Aguirre's Buick, Aguirre drove a Trans Am, which [Petitioner] also sometimes drove, over to Atondo's apartment and spent the night there.  The next morning, the Trans Am was gone and Atondo's Buick was in the complex parking lot.  Aguirre immediately called Petitioner from her cell phone. [Petitioner] was angry and told her that she was making him "'look really stupid in front of the guys'" because "'the guys'" told him they saw his car parked in front of Atondo's home.  Aguirre became angry and told [Petitioner] to stop talking to her about it.

On December 18, 2003, [Petitioner] again asked Aguirre to "give him a shot."  He said that, if Atondo were not around, she could love [Petitioner] again.  Aguirre said that it had nothing to do with Atondo, but that she was no longer attracted to [Petitioner].  Aguirre asked [Petitioner] why they could not just be friends, but [Petitioner] said that it was not enough.  Aguirre said that she was sorry, but she could not then have [Petitioner] in her life anymore.  She said that she did not want him to call her or come by her house ever again.

On the night of December 20, 2003, Aguirre sent Atondo an e-mail, telling him that he and his family were in her thoughts as the holidays approached.  Atondo did not respond to the e-mail.  On the morning of December 22, 2003, Atondo telephoned Aguirre and angrily complained about her e-mail, telling her to leave him alone.  Aguirre did not understand why Atondo was angry.  Later that night, Atondo forwarded to Aguirre a copy of the e-mail that he had been talking about; the e-mail had not come from her even though it was signed "'Always Ruby.'"  FN2.  Aguirre e-mailed Atondo that the message had not come from her, but he responded that he did not believe her.  The last e-mail Aguirre sent Atondo was around 11:00 p.m. that night.

> FN2.  A copy of the e-mail message was admitted into evidence as exhibit No. 43.  The message reads: "ok, [¶] I couldn't help myself again.  Guess you're not going to respond to my message, . . . just as I figured.  Probably still pissed off at me for telling Jamie about you raping me . . . WHICH YOU DID!  You're such a fucking pig, . . . I can't get that out of my mind.  I thought . . . well,

3

let's not go there.  I see you have another piece of ass
to fuck, huh? [¶] Yeah, . . . I saw Celia getting into
her car with you in the white truck right behind her gold
car.  And don't even try to deny it because you'll just
continue to be nothing more that a fucking li[a]r, . . .
as usual!  You're doing what you want.  I'm getting
fucked by someone else too, . . . so I guess we'[re] even
there.  I need to vent, so if you plan on responding back
to my message, I'll just play along and do the dumbgirl
part where I won't even know what you're talking about.
Oh!, . . . but you'll probably like that anyways because
you're into fucking brainless women anyways; . . . or the
ones that are at least easy for you to rape, that is!  I
feel so sorry for that little girl of yours because she
has the kind of father that you are.  Still think I'm
psyco?  Oh, . . . or are you having you daughter take
care of you in that way now?  [¶] Always Ruby."

Atondo lived with Jesalia, who was 11 years old at the time of
trial, in apartment 8 on the second floor of a complex in
Sunnyvale.  Raymond Atondo III (Raymond), Atondo's son, lived
with his family in apartment 9, next door to Atondo and
Jesalia.  On the night of December 22, 2003, Jesalia fell
asleep on the couch in her apartment while Atondo slept on a
mattress on the living room floor.  Jesalia woke up and saw a
man wearing a black ski mask and carrying knives in his back
pocket.  Atondo asked the man why he was there, and the man
said that he was there because Atondo had hurt somebody.
Atondo said that he did not hurt anyone.  The man zapped
Atondo on the chest with something, and Atondo fell.  The man
put a knife to Atondo's neck and tied his arms behind his back
with plastic ties.  Atondo asked the man not to hurt his
daughter.  The man said that he was not there for her and put
the knife back in his pocket.  The man told Jesalia to go to
her room and to lie on her stomach on her bed, which she did.
Jesalia could hear bumping and the man and Atondo yelling at
each other.  When Atondo yelled for help, Jesalia tried to get
help from her brother and sister-in-law by pounding on her
bedroom wall.  The man came into her room to see what she was
doing.  Later, she broke the screen on her bedroom window,
jumped out, and went to her brother's apartment next door.

Around 2:00 a.m. on December 23, 2003, Raymond and his wife
Bianca heard loud bangs that Raymond realized were coming from
Atondo's apartment.  Raymond also heard buzzing, like from a
bug zapper, and heard his own bedroom window break.  He
started to get dressed.  When he heard his father, Atondo,
repeatedly yell "'help,'" he dialed 911, handed the phone to
Bianca, and went outside to the back balcony.  Atondo was
standing there next to Raymond's bedroom window, bleeding.
Raymond ran to Atondo, who coughed up blood and said that he
could not breathe.  Raymond went inside to grab something to
stop the bleeding, but by the time he returned Atondo had
collapsed.  Jesalia climbed out her bedroom window and said

4

**United States District Court**
For the Northern District of California

somebody was still inside.  Raymond told Jesalia to go inside his apartment and she did.  She was hysterical.  Raymond ran inside Atondo's apartment, but he did not see anybody in there.

Around 2:10 a.m. on December 23, 2003, Sunnyvale public safety officers responded to a report of a stabbing at an apartment complex.  They located Atondo lying on the back second-floor landing.  There were no signs of forced entry on either the front or back door of Atondo's apartment.  There was a blood trail from the mattress in the living room to a large pool of blood on the kitchen floor, and from there out to where Atondo lay.  There were also blood stains on other items in his living room and on the walls and back door, and blood smears on the interior and exterior of the window in Jesalia's bedroom.  A piece of latex that appeared to be from a glove was found on the mattress, pieces of large plastic zip-ties and a can of pepper spray were found near the mattress, and a black ski-mask was found nearby.  The condition of Atondo's apartment was not consistent with there having been a mutual fight or combat in there.  No weapon consistent with Atondo's injuries was found in the apartment or the complex.  Officers seized a computer from the apartment.

Atondo died of multiple stab and incised wounds.  Incised wounds are superficial; they are longer than they are deep.  Stab wounds are deeper than they are long.  Atondo had five incised wounds around his head and neck and four incised wounds on the back of his right hand.  He had two stab wounds in his neck, two in his chest, one in his abdomen, and two around his left shoulder.  All of the stab and incised wounds were sustained around the time of death. One four-and-one-half-inch-deep stab wound on the right side of Atondo's neck would have been almost immediately fatal.  The stab wound cut neck muscles, the right jugular vein, branches of the right carotid artery, and the trachea.  It caused a significant loss of blood, some of which went into Atondo's lungs, preventing him from breathing.

Atondo also had two or three pairs of abrasions surrounded by contusions on the right side of his abdomen, and linear abrasions on his arms.  Atondo's injuries were consistent with Atondo having first had a stun gun used on him two or three times, and then having been restrained by the use of plastic zip-ties, having been stabbed, and having had his throat slashed.

Atondo's computer revealed that he received the December 22, 2003 e-mail message from Ruby Aguirre's e-mail account, which was signed "Always Ruby," at 2:56 a.m. on December 22, 2003.

Officers informed Aguirre of Atondo's death the morning of December 23, 2003.  She provided several e-mails to officers.  Officers asked Aguirre to call [Petitioner] to find out

whether he was involved in the homicide.  When Aguirre called [Petitioner], he said that he did not want to talk to her on the phone, but he would come to her house.  Officers arrested [Petitioner] when he arrived at Aguirre's home in a black Trans Am shortly after their telephone conversation.  Officers also seized Aguirre's personal computer from her home with her permission. [Petitioner] had minor marks on his face, hands and wrists when he was booked into jail, but he had no marks or injuries on his neck or throat.

Police searched [Petitioner]'s residence FN3 on December 23, 2003.  They seized various knives from the kitchen and pantry, a pepper spray canister from [Petitioner]'s bedroom, packaging for a different kind of pepper spray from a recycling container, and a receipt for the pepper spray showing that it was purchased the morning of December 22, 2003.  They seized a piece of paper with the name "Atondo R." and Atondo's phone numbers on it in [Petitioner]'s handwriting from the bookcase in [Petitioner]'s bedroom, and a computer that had a name tag of "Ruby Aguirre" and Aguirre's expired driver's license attached to it from [Petitioner]'s bedroom.  The computer revealed that the December 22, 2003 early morning e-mail message to Atondo signed "Always Ruby" had been sent from it at 2:51 a.m. that morning.

    FN3. Four other people also lived at [Petitioner]'s residence.

Sunnyvale detectives interviewed [Petitioner] on the evening of December 23, 2003.  The interview was videotaped, and an edited DVD of it, exhibit No. 45, was played for the jury. After waiving his Miranda rights, FN4 [Petitioner] told the detectives that he was not in Sunnyvale the night before and acted surprised to hear that Atondo was dead. [Petitioner] said that he needed to talk to Aguirre.  Officers arranged for and taped the telephone conversation and a CD of it, Exhibit No. 48, was played for the jury.  During his conversation with Aguirre, [Petitioner] said, "I just found out about the end result of what happened."  "He attacked me."  "I was popping off at the mouth.  I tried to leave.  Then we started fighting."  "I was leaving.  I was leaving.  He was choking me out.  We were fighting in the kitchen.  He was choking me out."  "He would [have killed me]."  "I did not mean to bring this down on you."  "But I did, but it wasn't intentional." "We started fighting in the kitchen.  I fell.  We slipped, we both fell.  He started choking me out.  I reached for whatever was there."  "I didn't know what had happened.  I just left." "It all happened so fast.  I know I, I-I know I had, I know [I] had hit him.  I left.  I was scared.  I just left.  It wasn't intentional.  I didn't go there for any of that."  "I didn't mean to make him suffer.  I didn't mean for any of that to happen."  "I went over there with good intentions.  Not for any of this crap.  You gotta believe me on that part.  I didn't go over there to do that to him."  "I want you to

understand that I didn't go over there with the intentions to hurt this man."

    FN4.  <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

Officers searched the black Trans Am on December 24 and 26, 2003.  They found a briefcase containing [Petitioner]'s driver's license and his California ID, as well as [Petitioner]'s day-planner and mail addressed to him.  They seized a small red sheath often used to hold pepper spray canisters that was consistent with the pepper spray can found in Atondo's apartment, a box of latex gloves, and a piece of notepad paper that had an address and telephone number on it in Aguirre's handwriting.  The piece of paper said "From the desk of Ruby E. Aguirre," and the handwritten address was for the vacant apartment 7 next door to Atondo.  FN5. Officers also collected a blood sample from the left rear corner of the driver's side floor mat. Test results of the sample indicated that Atondo was the source of the blood.

    FN5. Aguirre testified that she did not write the number 7 that was on the paper.

A couple weeks after [Petitioner] was arrested, Aguirre received a letter from him that she turned over to officers. The letter gave the same version of the events on December 22, 2003, that [Petitioner] had previously given Aguirre.  FN6.

    FN6.  The letter states in part: "This whole ordeal is such a nightmare. None of this wasn't or shouldn't have happened as any of it was the furthest thing from my mind, at least my intentions.  You've got to believe that, babe.  I only went there to simply talk to the man and nothing more.  Can't also stop thinking about Salia [] the little girl.  From an invitation to come in and talk calmly to a full blown physical altercation, I can't imagine what she must have thought what had gone wrong, but only how frightened that poor girl surely had to have been.  My prayers have been constantly on her and her father, for you and our peanut, as well I've been praying for too."

The Defense Case

Patricia Aboud lived downstairs from apartment 7 in Atondo's complex in December 2003.  Sometime around 1:00 a.m. on December 23, 2003, she heard several thuds against the walls upstairs and two loud, angry voices.  The noises lasted around five minutes. About one minute later she heard Raymond running around and screaming.

The parties stipulated that when officers interviewed Jesalia on December 26, 2003, she said that she had been awakened by the sounds of talking between her father and a man.  She also

United States District Court<br>For the Northern District of California

said that, while in her bedroom, she heard her father say "Give me that."

(Resp. Ex. 6 at 2-9.)

LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000). The first prong applies both to questions of law and to mixed questions of law and fact, id. at 407-09, and the second prong applies to decisions based on factual determinations, Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13. A state court decision is an "unreasonable application of"

8

Supreme Court authority, under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. Id. at 409.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El, 537 U.S. at 340.  A petitioner must present clear and convincing evidence to overcome the presumption of correctness under § 2254(e)(1); conclusory assertions will not do. Id.  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).

If constitutional error is found, habeas relief is warranted only if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion of the highest court to analyze whether the state

judgment was erroneous under the standard of § 2254(d).  Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).  In the present case, the California Court of Appeal is the highest court that addressed Petitioner's claims.

DISCUSSION

Petitioner raises three claims in his Petition.  Two allege jury instruction errors and the third alleges that there was insufficient evidence to support the finding that the murder involved torture.  All claims are discussed below.

I.    Jury Instruction Caljic No. 5.54[2] (2004 Re-revision)

Petitioner claims that the trial court erred when it instructed the jury with CALJIC No. 5.54 because that instruction improperly limited the right of self-defense by an initial aggressor against a sudden and deadly counter-assault to circumstances in which the initial aggressor had attacked by "simple assault." (Petition, Attachment 1 at 1.)  In other words, argues Petitioner, the instruction was an improper statement of the law "when it limited the right of the initial aggressor to acquire or regain the right to self-defense, without a need to attempt to withdraw from the affray, only to those circumstances where the

---

[2]  CALJIC No. 5.54 states as follows:  The right to self-defense is only available to a person who initiated an assault, if [¶] 1. He has done all the following: [¶] A. He has actually tried, in good faith, to refuse to continue fighting; [¶] B. He has by words or conduct caused his opponent to be aware, as a reasonable person, that he wants to stop fighting; and [¶] C. He has by words or conduct caused his opponent to be aware, as a reasonable person, that he has stopped fighting. [¶] After he has does these three things, he has the right to self-defense if his opponent continues to fight, or [¶] 2. If the victim of simple assault responds in a sudden and deadly counterassault, the original aggressor need not attempt to withdraw and may use reasonably necessary force in self-defense.

United States District Court
For the Northern District of California

opponent, who was responding with a sudden and deadly counterattack, was initially only a victim of simple assault." (<u>Id.</u> at 4.)

A challenge to a jury instruction solely as an error under state law is not cognizable in federal habeas corpus proceedings. <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  <u>See</u> <u>id.</u> at 72.  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  <u>See</u> <u>id.</u>  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  <u>United States v. Frady</u>, 456 U.S. 152, 169 (1982) (citing <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977)).

**United States District Court**
For the Northern District of California

1   After discussing CALJIC Nos. 5.54 and 5.56[3] (Self-Defense --

2   Participants in Mutual Combat), as well as CALCRIM No. 3471,[4] the

3   California court of appeal addressed this claim in the following

4   passage:

5
> We disagree with [Petitioner]'s contention.  Under the
> reasonable interpretation of the evidence that [Petitioner]
6   > puts forth on appeal, [Petitioner] stabbed Atondo either while
> [Petitioner] and Atondo were engaged in mutual combat, or
7   > after Atondo used excessive force in a counterattack while
> [Petitioner] was attempting to withdraw after initially being
8   > the aggressor.  Jesalia testified that she saw [Petitioner],
> who was wearing a mask, zap Atondo on the chest with
9   > something, causing Atondo to fall, shortly after she woke up
> in the living room. [Petitioner] then tied Atondo's hands
10  > behind his back.  After she went into her bedroom as
> instructed, she heard bumping and [Petitioner] and Atondo
11  > yelling at each other.  She also heard Atondo yelling for

12

13  [3]  CALJIC No. 5.56 states as follows: The right of self-defense
is only available to a person who engages in mutual combat: [¶] 1. If
14  he has done all the following: [¶] A. He has actually tried, in good
faith, to refuse to continue fighting; [¶] B. He has by words or
15  conduct caused his opponent to be aware, as a reasonable person, that
he wants to stop fighting; and [¶] C. He has caused by words or
16  conduct his opponent to be aware, as a reasonable person, that he has
stopped fighting; and [¶] D. He has given his opponent the opportunity
17  to stop fighting. [¶] After he has done these four things, he has the
right to self-defense if his opponent continues to fight, or [¶] 2.
18  If the other party to the mutual combat responds in a sudden and
deadly counterassault, that is, force that is excessive under the
19  circumstance, the party victimized by the sudden excessive force need
not attempt to withdraw and may use reasonably deadly force in
20  self-defense.

21  [4]  CALCRIM No. 3471 has replaced both CALJIC Nos. 5.54 and 5.56
and states as follows: A person who engages in mutual combat or who
22  is the first one to use physical force has a right to self-defense
only if: [¶] 1. He/she actually and in good faith tries to stop
23  fighting; and [¶] 2. He/she indicates, by word or by conduct, to his
her opponent, in a way that a reasonable person would understand, that
24  he/she wants to stop fighting and that he/she has stopped
fighting[;/.][¶] and 3. He/she gives his/her opponent a chance to stop
25  fighting.] [¶] If a person meets these requirements, he/she then has
a right to self-defense if the opponent continues to fight. [¶] [ If
26  you decide that the defendant started the fight using non-deadly force
and the opponent responded with such sudden and deadly force that the
27  defendant could not withdraw from the fight, then the defendant had
the right to defend himself/herself with deadly force and was not
28  required to stop fighting.]

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

help. [Petitioner] stated in his letter to Aguirre that "a full blown physical altercation" occurred between Atondo and himself. [Petitioner] told Aguirre in their telephone conversation that he first hit Atondo and then he tried to leave, but that he stabbed Atondo after Atondo attacked and tried to strangle him.

CALJIC No. 5.54 correctly informed the jury that [Petitioner] had the right of self-defense, even if he were the initial aggressor, if the jury found either that [Petitioner] had stopped fighting before Atondo attacked him or that [Petitioner] committed a simple assault but was responding to a sudden and deadly counterassault by the victim. (Citation omitted.) In addition, CALJIC No. 5.56 correctly informed the jury that [Petitioner] had the right of self-defense, even if he were engaged in mutual combat, if the jury found either that he had attempted to stop fighting and the victim continued to fight or that he was subjected to a sudden and deadly counterassault that was excessive under the circumstances and he used reasonably necessary force in self-defense. (Citation omitted.) Thus, under the reasonable interpretation of the evidence that [Petitioner] puts forth on appeal, and the entire charge to the jury, the jury was not "totally and completely precluded" "from the consideration of the above-described evidence as being a legitimate and legal basis for acquiring or regaining the right to self-defense," and the jury need not have "rejected in full [Petitioner]'s claim of self-defense." No error has been shown.

[Petitioner]'s contention at oral argument that CALJIC No. 5.54 improperly uses the term "simple assault," while CALCRIM No. 3471 properly uses the term "non-deadly force," does not change our analysis. The use of the term "simple assault" in CALJIC No. 5.54 cannot be viewed in isolation. (<u>People v. Moore</u>, supra, 44 Cal.App.4th at pp. 1330-1331.) We agree with the Attorney General that, in the context of the charge and considering the jury instructions as a whole, the term "simple assault" in CALJIC No. 5.54 has a similar meaning as the term "non-deadly force" does in CALCRIM No. 3471. CALJIC No. 5.54 correctly informed the jury, just as CALCRIM No. 3471 would have, that [Petitioner] could use reasonable deadly force in self-defense, even if he were the initial aggressor, if the victim of [Petitioner]'s simple or non-deadly assault responded in a sudden and deadly counterassault.

(Resp. Ex. 6 at 14-15.)

As an initial matter, the Court cannot grant habeas relief based on an alleged error in state law. <u>Estelle</u>, 502 U.S. at 68. Thus, to the extent Petitioner merely claims that the trial court erred in failing to instruct the jury in accordance with CALCRIM

13

**United States District Court**
For the Northern District of California

No. 3471 under state law, his claim is not cognizable on federal habeas review. See id. at 71-72.

Even assuming Petitioner's instructional error claim constitutes a federal claim and the instruction was erroneous, Petitioner cannot demonstrate that he suffered actual prejudice as a result. See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). Petitioner's theory of defense was not that he attacked Atondo in only a simple assault. Petitioner argued that the evidence supported the theory that he had no intention of killing Atondo. (RT 568-69.) After Petitioner was arrested, he spoke with Aguirre by phone, and the conversation was recorded by the police. (Resp. Ex. 1, Vol. 3 at 72-91.) In the conversation, Petitioner asserted that he was "popping off at the mouth" and then tried to leave. (Id. at 75-76.) According to Petitioner, he was trying to leave when Atondo attacked him and started choking him. (Id. at 82, 84.) That was when they started fighting and "[i]t all happened so fast". (Id. at 84-85.)

Viewing the evidence in the light most favorable to Petitioner's theory, it could have supported a factual finding that Petitioner used non-deadly force to attack Atondo, for which CALJIC No. 5.54 was appropriate. Moreover, even though subdivision (2) of CALJIC No. 5.54 does not require it, according to Petitioner, he tried to withdraw when he was suddenly attacked by Atondo. The evidence could also have supported a factual finding that Petitioner and Atondo were engaged in mutual combat once Atondo attacked him, for which CALJIC 5.56 was appropriate. In short, Petitioner fails to demonstrate how the claimed error in giving

14

CALJIC 5.54 "had substantial and injurious effect or influence in determining the jury's verdict."  <u>Brecht</u>, 507 U.S. at 637.

Accordingly, the California court of appeal's decision denying relief on this claim was not contrary to or an unreasonable application of clearly established federal law.  <u>See</u> 28 U.S.C. § 2254(d).

II.  Incomplete Jury Instruction on Imperfect Self-defense

Petitioner claims that the trial court had a sua sponte duty to instruct the jury correctly on all applicable legal principles with regard to an imperfect self-defense theory.  (Petition, Attachment 2 at 2.)  Specifically, Petitioner asserts that "all the ancillary rules of self-defense, such as, the assailed person need not retreat (CALJIC No. 5.50), actual danger is not necessary (CALJIC No. 5.51) and the regaining of the right to self defense by the initial aggressor, . . . are equally applicable to imperfect self-defense."  (Petition, Attachment 2 at 2.)  Petitioner claims that the error was compounded with the giving of CALJIC No. 5.17, in which the jury was instructed that imperfect self-defense was unavailable if Petitioner unlawfully created the circumstances which legally justified his opponent's use of force, attack, or pursuit.

The California court of appeal addressed this claim as follows:

> [Petitioner] was entitled to invoke the doctrine of imperfect self-defense because, although [Petitioner]'s criminal conduct certainly set in motion the series of events that led to the fatal stabbing, a retreat by [Petitioner] would have extinguished the legal justification for Atondo's attack on [Petitioner]. (Citation omitted.)  And, as [Petitioner] argues, the record would support a conclusion that Atondo was taking the law into his own hands when he attacked

15

[Petitioner] in the kitchen as [Petitioner] was attempting to retreat. (Citation omitted.) [Petitioner] told Aguirre both in their telephone conversation and in his letter that he was attempting to leave when Atondo attacked him in the kitchen.

CALJIC No. 5.17 as given informed the jury that [Petitioner] was entitled to invoke the doctrine of imperfect self-defense in order to reduce the charge of murder to manslaughter as long as [Petitioner] did not create the circumstances which justified Atondo's attack on him. If [Petitioner] was retreating at the time of Atondo's attack, he was no longer creating circumstances which justified Atondo's attack on him. Thus, the trial court properly instructed on the doctrine of imperfect self-defense, including telling the jury when it was not available.

"'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]" [Citation omitted.] In this case the trial court gave the standard instruction defining the doctrine of imperfect self-defense, and [Petitioner] did not ask the court to modify or amplify the instruction. Accordingly, [Petitioner]'s claim of error is waived unless his substantial rights were affected by the standard instruction. That is, if [Petitioner] was prejudiced by the instruction as given, then no request for amplification or modification was required. [Citations omitted.]

In this case we conclude that [Petitioner] was not prejudiced by the instruction, CALJIC No. 5.17, as given. "It is well established that [an] instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record. [Citation.]" [Citation omitted.] The trial court fully instructed the jury on [Petitioner]'s theory of defense, that he stabbed Atondo in self-defense and with no intent to kill him. The court's instructions fully covered the concept of self-defense and the doctrine of imperfect self-defense. By finding that the killing was intentional and involved the infliction of torture [citation omitted], the jury necessarily rejected the defense theories of self-defense and imperfect self-defense. Based on the entire record on appeal, including the evidence and the entire charge to the jury, we cannot say that, had the court amplified or modified CALJIC No. 5.17 as [Petitioner] now claims, it is reasonably probable that a more favorable result would have occurred. (Citation omitted.)

(Resp. Ex. 6 at 17-19.)

As an initial matter, Petitioner presents this claim only as a state law claim, based on decisions of the California Supreme Court

United States District Court
For the Northern District of California

interpreting California law, which cannot be the basis for federal habeas relief. <u>See</u> <u>Estelle</u>, 502 U.S. at 67-68 (federal habeas unavailable for violations of state law or for alleged error in the interpretation or application of state law). Petitioner cannot make a state law claim into a federal claim simply by asserting that it was a federal constitutional error, as Petitioner does here. <u>See</u> <u>Langford v. Day</u>, 110 F.3d 1380, 1389 (9th Cir. 1996) (petitioner may not "transform a state-law issue into a federal one merely by asserting a violation of due process."). Petitioner is not entitled to federal habeas relief on this state-law claim.

Alternatively, even if Petitioner's instructional error claim constituted a federal claim and the instruction was erroneous, Petitioner cannot demonstrate that he suffered actual prejudice as a result. <u>See</u> <u>Brecht</u>, 507 U.S. at 637. The state appellate court reasonably found that, because the challenged jury instruction properly included Petitioner's theory of defense, the alleged omissions did not have a substantial or injurious effect on the jury's verdict. <u>See</u> <u>id.</u>

Accordingly, the California court of appeal's decision denying relief on this claim was not contrary to or an unreasonable application of clearly established federal law. <u>See</u> 28 U.S.C. § 2254(d).

III. Insufficient Evidence to Support Special Circumstance of Torture

Petitioner claims that there was insufficient evidence to support the finding on the special circumstance of murder involving

**United States District Court**
For the Northern District of California

1   torture pursuant to California Penal Code § 190.2(a)(18).[5]

2   (Petition, Attachment 3 at 1.)  Specifically, Petitioner argues

3   that "there is no substantial evidence in the record that, at any

4   time during the attack on Raymond Atondo (the decedent), petitioner

5   had the necessary intent to cause cruel or extreme pain and

6   suffering for the purpose of revenge, extortion, persuasion or for

7   any sadistic purpose." (Petition, Attachment 3 at 2.)

8       The Due Process Clause "protects the accused against

9   conviction except upon proof beyond a reasonable doubt of every

10  fact necessary to constitute the crime with which he is charged."

11  In re Winship, 397 U.S. 358, 364 (1970).  A federal court reviewing

12  collaterally a state court conviction does not determine whether it

13  is satisfied that the evidence established guilt beyond a

14  reasonable doubt.  Payne v. Borg, 982 F.2d 335, 338 (9th Cir.

15  1992).  The federal court "determines only whether, 'after viewing

16  the evidence in the light most favorable to the prosecution, any

17  rational trier of fact could have found the essential elements of

18  the crime beyond a reasonable doubt.'"  See id. (quoting Jackson v.

19  Virginia, 443 U.S. 307, 319 (1979)).  If confronted by a record

20  that supports conflicting inferences, a federal habeas court "must

21  presume--even if it does not affirmatively appear on the record--

---

23      [5]  The court instructed the jury pursuant to CALJIC No. 8.81.18
    as follows: "To find that the special circumstance referred to in
24  these instructions as murder involving infliction of torture is true,
    each of the following facts must be proved: [¶] 1. The murder was
25  intentional; and [¶] 2. The defendant intended to inflict extreme
    cruel physical pain and suffering upon a living human being for the
26  purpose of revenge, extortion, persuasion or for any sadistic purpose,
    and [¶] 3. The defendant did in fact inflict extreme cruel physical
27  pain and suffering upon a living human being no matter how long its
    duration. [¶] Awareness of pain by the deceased is not a necessary
28  element of torture."  (RT 519.)

1  that the trier of fact resolved any such conflicts in favor of the

2  prosecution, and must defer to that resolution." <u>Jackson</u>, 443 U.S.

3  at 326.  Circumstantial evidence and inferences drawn from that

4  evidence may be sufficient to sustain a conviction.  <u>Walters v.</u>

5  <u>Maass</u>, 45 F.3d 1355, 1358 (9th Cir. 1995).  Mere suspicion and

6  speculation cannot support logical inferences, however.  <u>Id.</u>

7       The California court of appeal addressed this claim as

8  follows:

9       "[F]or purposes of proving murder by torture, the intent to
        inflict extreme pain 'may be inferred from the circumstances
10      of the crime, the nature of the killing, and the condition of
        the victim's body.' [Citation.]  But we also have 'cautioned
11      against giving undue weight to the severity of the victim's
        wounds, as horrible wounds may be as consistent with a killing
12      in the heat of passion, in an 'explosion of violence,' as with
        the intent to inflict cruel suffering.' [Citation.]" [Citation
13      omitted.] "'[T]he prosecution was not required to prove that
        the acts of torture inflicted upon [the victim] were the cause
14      of his death.' [Citation.]" [Citation omitted.]  Section
        190.2, subdivision (a)(18) requires only "'some proximity in
15      time [and] space between the murder and torture.' [Citation.]
        The statute obviously does not apply where 'no connection'
16      between the two events appears. [Citation.]" [Citation
        omitted.]
17
        In this case, there was evidence that [Petitioner] used a stun
18      gun on Atondo two or three times prior to inflicting the
        stabbing wounds that caused Atondo's death.  Jesalia testified
19      that she saw [Petitioner] zap Atondo on the chest with
        something, causing him to fall.  Raymond testified that he
20      heard buzzing, like from a bug zapper, coming from Atondo's
        apartment.  Injuries consistent with a stun gun having been
21      used on Atondo two or three times prior to his death were
        observed during his autopsy.  In addition, there was evidence
22      that a stun gun causes a tremendous amount of pain in a
        victim, but does not immobilize the victim, and that it is
23      meant to cause so much pain that the victim will stop
        resisting.  There was also evidence that [Petitioner] owned a
24      stun gun at the time of Atondo's death.  This is substantial
        evidence that [Petitioner] intended to inflict extreme cruel
25      physical pain and suffering for the purpose of revenge or
        persuasion, and that he in fact did so by use of a stun gun
26      just prior to killing Atondo.  Even though these acts did not
        actually cause Atondo's death, substantial evidence supports
27      the finding that the murder "involved the infliction of

28

torture" within the meaning of section 190.2, subdivision (a)(18). [Citation omitted.]

(Resp. Ex. 6 at 21-22.)

Here, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319. In California, to find the special circumstance of torture, the jury must find that Petitioner had the intent to inflict extreme pain.[6] See People v. Cole, 33 Cal. 4th 1158, 1212 (2004).

Viewing the evidence in the light most favorable to the prosecution, such intent can be inferred. Petitioner clearly had a motive to punish Atondo and mentioned to Aguirre several times that he could "take care of" Atondo, beat him up, or kill him for raping Aguirre. Petitioner went to Atondo's house at 2:00 a.m. equipped with knives, a stun gun, zip ties, latex gloves, and pepper spray. (RT 72-82, 181-82.) Petitioner inflicted seven deep knife wounds on Atondo's torso and neck and five long, skin-deep knife wounds around Atondo's head and neck. (RT 108-112.) The evidence showed that, prior to using the knife on Atondo, Petitioner used the stun gun on Atondo at least two or three times. (RT 113-117.) An expert witness noted that stun guns are typically used to incapacitate its victims through inflicting pain and opined that the stun would case "horrendously intense" pain. (RT 263, 278.)

---

[6] Although Petitioner hints at the argument that he did not inflict extreme pain and suffering (Petition, Attachment 3 at 2-3), he does not actually argue that there was insufficient evidence of this element. Rather, Petitioner's legal argument specifically addresses only the claim of insufficient evidence of the intent to inflict cruel or extreme pain. (Id.) at 1-5.)

United States District Court
For the Northern District of California

Thus, taking into consideration "all the circumstances surrounding the charged crime, including the nature and severity of the victim's wounds," see People v. Bemore, 22 Cal. 4th 809, 841-42 (2000), the California court's rejection of Petitioner's sufficiency of the evidence claim was not contrary to or an unreasonable application of Jackson.

CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is denied.

No certificate of appealability is warranted in this case. See Rule 11(a) of the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (requiring district court to rule on certificate of appealability in same order that denies petition).  Petitioner has failed to make a substantial showing that any of his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find this Court's denial of his claims debatable or wrong.  See Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The clerk shall enter judgment and close the file.  All pending motions are terminated.  Each party shall bear his own costs.

IT IS SO ORDERED.

Dated: 3/28/2011

CLAUDIA WILKEN
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

JOHNNY A. MARTINEZ,

         Plaintiff,

  v.

MICHAEL S. EVANS et al,

         Defendant.

_____/

Case Number: CV08-04736 CW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on March 28, 2011, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Johnny A. Martinez P-27508
Salinas Valley State Prison
P.O. Box 1050
Soledad,  CA 93960

Dated: March 28, 2011

Richard W. Wieking, Clerk
By: Nikki Riley, Deputy Clerk

**United States District Court**
For the Northern District of California

22